RACINE IRON COMPANY *et al. v.* McCOMMONS *et al.*

1. The "interstate commerce clause" of the constitution of the United States does not operate to prevent a State from imposing, for the purpose of raising revenue, a license tax upon persons who, as traveling agents for principals residing in other States, make executory contracts for the sale of goods, and who, when the same are shipped into this State, receive them in bulk, break the original packages in which they are contained, and distribute them among the customers with whom such contracts have been made.

2. One upon whose property an execution against another issued by a tax-collector is levied may, under the Political Code, § 899, interpose a claim, and consequently has no need of an injunction to prevent the threatened sale.

Submitted March 20, — Decided August 7, 1900.

Petition for injunction. Before Judge Hart. Greene superior court. October 14, 1899.

*James Davison* and *J. S. Reynolds*, for plaintiffs.
*Park & Merritt*, for defendants.

LUMPKIN, P. J. The Racine Iron Company of Wisconsin and G. H. Pettigrew filed an equitable petition to enjoin the tax-collector and the sheriff of Greene county from proceeding with an execution against Pettigrew, which had been issued by the collector and by the sheriff levied on property alleged to be that of the company. The execution purports to have been issued for a "special tax for the year 1898." It does not contain a recital that the tax was due by Pettigrew as a peddler. The petition, however, raised no objection to the execution on this ground, but expressly dealt with it as if it had embraced such a recital. Apparently, the tax sought to be collected was for the year 1899, for the facts disclosed at the hearing, about which, as will presently be seen, there was no dispute, plainly so indicated. The answer of the defendants alleges that the tax in question was for that year, and the petition distinctly avers that the "tax act of the General Assembly of Georgia for 1898, so far as it applies to petitioners or each of them, is repugnant to art. 1, sec. 8, par. 3 of the constitution of the United States, and as to them unconstitutional and void." This act is the one by which all State taxes for the years 1899 and 1900 were imposed. It seems, therefore,

that the appearance of the figures "1898" in the copy of the execution must be due to an error in transcribing. At any rate, it is certain that the petition squarely presents the question whether or not the paragraph of our tax act of 1898 which imposes a license tax upon certain classes of peddlers is, so far as it relates to the business carried on by Pettigrew for the Iron Company, violative of the "interstate commerce clause" of the Federal constitution. Indeed, this is the main and controlling question in the case, and upon it counsel for both sides invoke a decision at our hands. The bill of exceptions alleges error in the refusal of the court to grant an interlocutory injunction upon the following agreed statement of facts: " G. H. Pettigrew sold in Greene county a lot of smoothing-irons, taking the notes of the purchasers therefor. The irons sold were the property of the Racine Iron Company of Wisconsin, and the defendant sold by sample and subsequently had shipped from its factory in Wisconsin his entire sales, in boxes 12 in a box, and consigned to G. H. Pettigrew as their local agent, who then delivered them to the purchasers on the sales previously made. No sales were made in Greene county after April, 1899. G. H. Pettigrew both solicited the orders and delivered the goods. G. H. Pettigrew is a resident of Louisiana. Said irons were sold for $7.75 each. Defendants in fi. fa. do not store goods in the State of Georgia, and have no warehouse or place of business in Georgia. R. L. Pettigrew, brother of G. H. Pettigrew, is the general agent of the Racine Iron Company for the south, and is a resident of Tennessee. The fi. fa. by the tax-collector for $100.00 was issued and levied as alleged in the petition for injunction."

1. It will be noted that, according to this statement of the facts, Pettigrew sold smoothing-irons, "taking the notes of the purchasers therefor," and that he "both solicited the orders and delivered the goods." It makes no difference whether he took from his customers promissory notes payable to the company, or written orders upon it, or both. In each instance the contract of sale was executory, and it required a delivery of the article bargained for to complete the sale. The form of the transaction is a matter of no consequence. Our tax act of 1898 imposes, for each of the years 1899 and 1900, " upon each ped-

dler of clocks or smoothing-irons" a specific occupation tax of "one hundred dollars in each county of the State in which such peddler may do business." Acts of 1898, p. 26. A stern sense of duty, not inclination, constrains us to enter upon a discussion of the question whether or not Pettigrew can, by virtue of the above-mentioned clause of the constitution of the United States, escape the payment of the tax imposed upon him by this act and for which the execution in controversy was issued. In endeavoring to find a solution of this question we have diligently sought for such aid as could be derived from authoritative utterances of the Supreme Court of the United States. The result of our researches in this direction will be developed as we progress. In Woodruff *v.* Parham, 8 Wall. 123, the doctrine was announced that: "The term 'import,' as used in that clause of the constitution which says that 'no State shall levy any imposts or duties on imports or exports,' does not refer to articles imported from one State into another, but only to articles imported from foreign countries into the United States. Hence, a uniform tax imposed by a State on *all* sales made in it, whether they be made by a citizen of it or a citizen of some other State, and whether the goods sold are the produce of that State enacting the law or of some other State, is valid." To the same effect, see Hinson *v.* Lott, Ibid. 148. "A discriminating tax upon non-resident traders trading in the limits" of a State other than that in which they reside can not, however, lawfully be imposed. Ward *v.* Maryland, 12 Wall. 418. Such a tax was, in Welton *v.* State of Missouri, 91 U. S. 275, held to be unconstitutional. In Machine Company *v.* Gage, 100 U. S. 676, the question was presented whether or not a sewing-machine agent who had been sent by a Connecticut corporation "into Sumner county [Tenn.] to sell machines there" was subject to a license tax imposed by a statute of that State upon "all pedlers of sewing machines and selling by sample." It appeared that while the corporation manufactured its machines at Bridgeport, in the State of its residence, it "had an agency at Nashville," Tenn., from which latter place its agent was sent into the county above mentioned. "The Supreme Court of Tennessee decided that the law of that State imposing" the tax in question was intended to apply to "all pedlers of sewing-

machines, without regard to the place of growth or produce of material or of manufacture;" and it was accordingly held by the Federal Supreme Court, upon a review of the judgment of the State court upholding the validity of the statute, "that the law, so construed, [was] not in violation of the Constitution of the United States."

Then came the now familiar, though at the time somewhat startling, decision in Robbins *v.* Shelby County Taxing District, 120 U. S. 489. Robbins, a citizen of Ohio, "was engaged at the city of Memphis, in the State of Tennessee, in soliciting the sales of goods for" a Cincinnati firm, "and exhibited samples for the purpose of effecting such sales,— an employment usually denominated as that of a 'drummer.'" He failed to pay a license tax imposed by statute upon persons of his calling, and a criminal prosecution was instituted against him on the charge of doing business without a license, which the statute "made a misdemeanor, punishable by a fine of not less than five nor more than fifty dollars." His conviction followed as a matter of course, and the same was sustained by the State Supreme Court upon the ground that the statute in question was not unconstitutional. In reviewing its judgment, Mr. Justice Bradley, speaking for a majority of the members of the Federal Supreme Bench, said that the inquiry presented was "whether it is competent for a State to levy a tax or impose any other restriction upon the citizens or inhabitants of other States for selling or seeking to sell their goods in such State before they are introduced therein." He further remarked, in the course of his opinion, that while the conclusion to the contrary reached by a majority of the court might, to some extent, operate to interfere "with the right of the State to tax business pursuits and callings carried on within its limits," yet this interference would be very limited in its operation, and would "only prevent the levy of a tax, or the requirement of a license, for making *neyotiations* in the conduct of interstate commerce." Indeed, all that was decided in that case was that a State has no power to impose an occupation tax upon a commercial drummer, who, in behalf of a non-resident principal, undertakes to do no more than exhibit a line of samples and solicit orders for goods which are at the time within the jurisdiction

of another State.    To this extent, and no further, did the court go in Corson v. Maryland, Ibid. 502, decided at the same term. On the same line are the cases of Asher v. Texas, 128 U. S. 129, and Stoutenburgh v. Hennick, 129 U. S. 141.    In neither was the doctrine announced in the Robbins case in any wise extended or applied to a different state of facts.

Next came a similar decision in the Brennan v. Titusville, 153 U. S. 289.    Brennan, at the time the restraining hand of the law was placed upon him, was engaged in a "house to house" canvass in pursuit of customers for pictures and picture-frames.    He merely exhibited his samples and solicited orders. Such orders as were procured he immediately forwarded to a non-resident principal, who shipped the goods "to the pur-chasers" direct "by railroad freight and express."    In some in-stances Brennan did collect the "price of said goods," but, so far as appears, he did not undertake to himself make delivery of any of the articles for which he received orders.    Commenting upon this feature of the case, Mr. Justice Gray, in Emert v. Missouri, 156 U. S. 296, said (pp. 319–320):    "In Brennan's case, it was expressly agreed by the parties that the goods of-fered by him for sale in Pennsylvania were afterwards sent by their owner in the other State directly to the purchasers."    An exhaustive and painstaking review of all previous decisions having any direct bearing upon the case then in hand was en-tered upon by the learned Justice, and the conclusion was an-nounced that it was distinguishable from every one of its pred-ecessors save only the case of Machine Co. v. Gage, 100 U. S. 676, which was "approved and followed."    The importance of getting a firm and intelligent grasp upon the facts on which the decision in Emert's case was rested is therefore apparent, especially in view of the fact that, so far as we have been able to ascertain, it presents the latest enunciation on the subject which the Federal Supreme Court has vouchsafed.    It is a cir-cumstance also worthy of comment that this decision was ren-dered without a dissent on the part of any of the Justices.    The precise ruling made was as follows :    "A statute of a State by which peddlers of goods, going from place to place within the State to sell them, are required, under penalty, to take out and pay for licenses, and which makes no discrimination between

residents or products of the State and those of other States, is not, as to peddlers of goods previously sent to them by manufacturers in other States, repugnant to the grant by the constitution to Congress of the power to regulate commerce among the several States." In conformity to what seems to have become quite a common custom in this class of cases, Emert went to trial upon an agreed statement of facts. We gather therefrom that while, possibly, he started out innocently enough as a mere soliciting agent, carrying with him on his travels a sewing-machine belonging to a non-resident principal, with the intention of doing no more with it than exhibiting it as a sample, he eventually forsook his original calling for that of an itinerant vender who not only *solicits* trade but actually *sells*. At all events, it was admitted that upon a specified day " he offered for sale, to various persons at different places," a sewing-machine which he carried along with him in a wagon, and that he did on the same day "find a purchaser for said machine and did sell and deliver the same to" him. In dealing with the facts thus presented, Mr. Justice Gray, speaking in behalf of all the members of the court, said (p. 311) : "The defendant's occupation was offering for sale and selling sewing-machines, by going from place to place in the State of Missouri, in a wagon, without a license. There is nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time. His dealings were neither accompanied nor followed by any transfer of goods, or of any order for their transfer, from one State to another; and were neither interstate commerce in themselves, nor were they in any way directly connected with such commerce. The only business or commerce in which he was engaged was internal and domestic; and, so far as appears, the only goods in which he was dealing had become part of the mass of property within the State. Both the occupation and the goods, therefore, were subject to the taxing power, and the police power, of the State." It was pointed out, in this immediate connection, that "the statute in question [was] not part of a revenue law," but was one looking solely to regulation, and designed, apparently, "to protect the citizens of the State against the cheats and frauds, or even thefts, which, as the experience of ages has shown, are likely

to attend itinerant and irresponsible peddling from place to place and from door to door. That is to say, the statute was one passed by virtue of the police power residing in the State, and not in the exercise of its right by taxation to raise revenue for its support.

This brings us to a consideration of the question whether or not there are in the case now before us any distinguishing features which can properly be said to differentiate it from that last cited. The two cases are not, upon their facts, identical. Pettigrew, the agent whose anomalous vocation is the cause of our present distress, first solicited orders for goods which at the time were in the hands of his non-resident principal. Then such orders as were in this manner procured were duly forwarded to be filled by the latter. Not a single order was, however, filled separately, but goods sufficient in quantity to fill the orders of a number of customers were shipped in bulk, consigned to Pettigrew himself; and, on receipt of each shipment, he broke the original packages in which the goods were sent, and proceeded to distribute the contents among such customers as were entitled thereto. From either a legal or a moral standpoint, it would therefore seem that Pettigrew belonged to a class of itinerants requiring as much police supervision as that of which Emert was a member. And if this be true, why would it not inevitably follow that the reasons assigned by Mr. Justice Gray for upholding the police regulation which Emert called into question could very fairly be said to apply equally as well to Pettigrew and his calling, if the statute now under consideration was one designed to protect the citizens of this State against fraud and imposition? As such is not the nature of this statute, we will not indulge in further conjecture on the line just suggested, but will discuss the question actually before us, which is: can the statute be upheld, as against Pettigrew and his principal, upon the ground that this State has not, in thus undertaking to exercise its inherent power of taxation, invaded the sacred precincts guarded by the interstate commerce clause of the Federal constitution? The purpose of the general tax act for 1899–1900 was not simply to impose taxes, but to actually raise revenue for the support of the State government; and, looking to that end,

penalties were prescribed for non-payment of the license taxes therein laid, regardless of the citizenship of the persons thereby affected. In support of the proposition that this was "an exercise, not of the police power, but of the taxing power" of the State, we need only cite Brennan v. Titusville, 153 U. S. 289.

Giving to the doctrine which was first announced in the Robbins case the widest possible scope which can legitimately be claimed for it, we fail to see how it controls the case in hand. On principle it is certainly true that a citizen of one State who is engaged in interstate commercial dealings can lawfully accomplish through the means of an agent neither more nor less than he himself would have a right to do in person. It is now well settled that no tax can be laid upon the exercise by a manufacturer of his privilege of visiting a State other than that of his residence with a view to creating a demand for his goods by exhibiting a sample thereof and securing orders therefor, i. e., seeking a market for his goods and taking advantage of it, when found, by entering into purely executory contracts of bargain and sale, to be performed in the State of his residence, by making actual delivery there to a common carrier there authorized to receive them in behalf of the persons who agree to buy. But what if he enters into a contract whereby he binds himself to make delivery to a customer in person within the State of the latter's residence? What if the parties expressly agree that the sale itself, as distinguished from the mere executory contract made in contemplation thereof, shall be of a wholly internal and domestic nature, having no interstate commerce feature about it? A customer has, of course, a constitutional right not only to agree to buy, but through his carrier-agent to actually buy, goods the situs of which is to continue at the home of the manufacturer until the sale is consummated there; and upon the exercise by the customer of this privilege no restriction could be lawfully imposed by the State in which he resided. Scott v. Donald, 165 U. S. 58; Vance v. Vandercook Co., 170 U. S. 438. Suppose, however, the customer does not choose to exercise this right, but, on the contrary, declines to even agree to purchase save upon the express stipulation that the goods shall be brought into the State by the manufacturer and then, and not until then, really sold? In that event the customer would

be in nowise concerned as to the methods employed by the manufacturer in order to meet his obligation to thus effect a change in the situs of the goods before calling upon the former to actually purchase the same; and if the manufacturer, as a matter of personal convenience to himself, should enter into an independent contract of carriage with a common carrier, whereby it acted as his agent in bringing the goods to the point agreed on as that where the sale should take place, this surely could not have the effect of introducing an interstate commerce feature into the transaction.

In Brown *v.* Houston, 114 U. S. 623, it was held that "Coal mined in Pennsylvania and sent by water to New Orleans to be sold in open market there on account of the owners in Pennsylvania becomes intermingled, on arrival there, with the general property in the State of Louisiana, and is subject to taxation under general laws of that State, although it may be, after arrival, sold from the vessel on which the transportation was made, and without being landed, and for the purpose of being taken out of the country on a vessel bound to a foreign port." This decision was based upon the doctrine announced in Woodruff *v.* Parham, supra, to the effect that goods shipped from one State into another for the purpose of sale become immediately subject to taxation by the latter State, notwithstanding they belong to a non-resident importer engaged in interstate commerce. See, also, in this connection, Coe *v.* Errol, 116 U. S. 517. The theory upon which it is held that an occupation tax sometimes operates as an unwarranted interference with interstate commerce, when laid upon a non-resident merchant or manufacturer, is that "A license tax required for the sale of goods is in effect a tax upon the goods themselves." Welton *v.* Missouri, 91 U. S. 275. Or, as was said in Machine Co. *v.* Gage, 100 U. S. 678; "A tax for a license to sell goods is in effect a tax on the goods authorized to be sold." When applied to a commercial drummer who merely "sells goods by sample," the goods being at the time in the hands of a non-resident principal, there is much force in the argument that, as the State in which the drummer solicits orders has no jurisdiction over the goods themselves and can not impose any direct tax upon them before they are shipped within its borders,

the State has no power to lay an indirect tax upon them by resorting to the expedient of requiring the drummer to pay a license fee for the privilege of pursuing a calling which is a legitimate and oftentimes necessary incident to commercial dealings between residents of different States. But the argument necessarily loses its force when, as in the present case, the goods, before delivery to the customer, are shipped into the State with a view to consummating the executory contract of sale. We see no reason why, as soon as the shipment is complete and the goods turned over to an agent of the shipper, they may not be immediately subjected to a direct tax, irrespective of the fact that a resident customer had previously been found who was willing to accept and pay for the goods when a proper tender of them was made to him. It would follow as a matter of course that if a direct tax could be laid on the goods while yet in the possession of the shipper or his agent, the State could, by imposing a tax upon the privilege of consummating the sale of the goods, reach them indirectly. The following extract taken from the opinion delivered by Mr. Justice Field in Welton's case seems to bear us out in the conclusion just stated; "The general power of the State to impose taxes in the way of licenses upon all pursuits and occupations within its limits is admitted, but, like all other powers, must be exercised in subordination to the requirements of the Federal constitution. Where the business or occupation consists in the sale of goods, the license tax required for its pursuit is in effect a tax upon the goods themselves. If such a tax be within the power of the State to levy, it matters not whether it be raised directly from the goods, or indirectly from them through the license to the dealer; but, if such tax conflict with any power vested in Congress by the constitution of the United States, it will not be any the less invalid because enforced through the form of a personal license."

It is true that in Bowman v. Railway Co , 125 U. S. 465, the reviewing court took occasion to present the quære, " whether the right of transportation of an article of commerce from one State to another includes by necessary implication the right of the consignee to sell it in unbroken packages at the place where the transportation terminates." But this doubt was suggested

with reference to the right of a State, in the exercise of its *police powers*, to forbid common carriers from bringing "intoxicating liquors into the State from any other State" without first complying with certain prescribed regulations.    We are also aware that it was subsequently held, in Leisy *v.* Hardin, 135 U. S. 100, that "a statute of a State prohibiting the sale of any intoxicating liquors, except" for medicinal and other like purposes, was, "as applied to a sale by the importer, and in the original packages or kegs, unbroken and unopened, of such liquors manfactured in and brought from another State, unconstitutional and void."    However, this decision was put upon the ground that, in undertaking to entirely prohibit such sales, the State exceeded its police powers and encroached upon the exclusive right vested in Congress to regulate interstate commerce. That Congress may itself impose restrictions upon, or entirely prohibit, interstate traffic in injurious commodities, was recognized in Rahrer's case, 140 U. S. 545.    The decision in Plumley *v.* Massachusetts, 155 U. S. 461, is authority for the proposition that a State has the power to prohibit the sale "of oleomargarine artificially colored so as to look like yellow butter" and purposely so made in imitation of pure butter with a view to deceiving the public, notwithstanding such imitation butter is manufactured in and brought from a sister State.    But when, in Schollenberger *v.* Pennsylvania, 171 U. S. 1, the question arose whether oleomargarine could "be wholly excluded from importation into a State from another State where it was manufactured," upon the idea that it was an injurious commodity, the court reiterated its ruling made in Leisy *v.* Hardin, cited above, and held that an importer had a right to sell this commodity in original packages, whether the same were "suitable for retail trade or not," and irrespective of the question whether a consumer or a wholesale dealer became the purchaser.

In referring to these several adjudications concerning the limits within which a State may properly exercise its *police* powers, we are not, as we have already indicated, to be understood as entertaining the opinion that any one of them has any bearing whatever upon the case at bar.    As matter of fact, we think directly to the contrary ; and, as evidencing the correctness of our conclusion that the Supreme Court of the United States has

never departed from the doctrine that the *taxing* power of a State is coextensive with its jurisdiction over property of a non-resident brought within its borders, we confidently cite American Refrigerator Transit Co. *v.* Hall, 174 U. S. 70, wherein it was held that a State could lawfully impose a revenue tax upon transient railway cars, notwithstanding "the fact that such cars were employed as vehicles of transportation in the interchange of interstate commerce," and paid only casual visits to the State in the course of extended peregrinations covering this entire country. Our real purpose in calling attention to what that court has said in regard to the right of an importer to sell his goods in the original packages in which they were shipped is, (1) to point out that he is not exempt from taxation upon such goods; and (2) to present the argument that, even were this otherwise, Pettigrew could rightly claim no immunity from taxation, for the reason that he did not attempt to dispose of goods in the original packages in which they were shipped to him, but in every instance broke such packages and peddled the contents thereof amongst his customers. We use the term "peddled" advisedly. From a purely legal standpoint, at least, he was a peddler; for, in view of the definition which our code gives to one of his vocation, it can matter little whether an itinerant trader carries along with him a "pack" and makes immediate delivery of his wares to customers, or merely "sells by sample" and waits a day, a week, or longer, before freighting himself with goods and undertaking to fill the orders he had previously procured by his house-to-house canvass. In this connection, see *Wrought Iron Range Co.* v. *Johnson,* 84 *Ga.* 754, 758.

In none of the decisions of this court wherein the subject herein dealt with has been under discussion do we find anything which militates against the views we have above expressed. We will, therefore, present but a brief review of them. In the case just cited, a foreign corporation and its traveling agent, Lee, joined in an equitable petition to enjoin the enforcement against them of certain executions levied upon their property. The controlling question presented was whether or not Lee was liable for the payment of a license tax imposed upon peddlers. He did no more than exhibit a sample and take orders for goods, and accordingly, in deference to previous rul-

ings announced by the Federal judiciary, which were authoritative, this court held that Lee's calling was exempt from a license tax. It is perhaps inferable from the facts appearing in that case that after he forwarded to the company at St. Louis such orders as he procured, it there filled the same and then shipped the goods to other agents in Georgia for delivery to the purchasers, the goods sometimes being stored in warehouses located in this State, until such delivery could be made. But no question was raised as to the right of these agents to thus make delivery, nor could Lee's right to pursue his inoffensive "interstate-commerce" calling without paying a license fee be in any wise affected by what they did or failed to do. For aught that was disclosed, they complied with the law as to taking out licenses; if not, the executions should have been directed against them, not against Lee or the company itself, it not being a peddler within the meaning of the statute under consideration. Had Lee been criminally prosecuted on the charge of confederating with other agents of the company with a view to evading the laws of this State and enabling them to carry on the business in which they were engaged without paying a license tax, it may be taken for granted that this court would not have confined itself to the inquiry whether or not his vocation was one upon which a license tax could lawfully be imposed. See *Duncan* v. *State*, 105 *Ga.* 457.

What has just been said also applies to *McClelland's* case, 96 *Ga.* 749. It there appeared that it was sometimes the practice of the company which ·he represented, when it had several purchasers at one point, to send the goods to one customer and notify "the others to call on that one for them, allowing him fifteen cents per package for delivery." McClelland was a traveling salesman, and did not himself attempt to deliver the goods for which he solicited orders. He was prosecuted on the charge of failing to take out a license, and therefore the only question presented was whether or not he should have done so.

In the case of *Singer Manufacturing Co.* v. *Wright*, 97 *Ga.* 114, it was held that: "A specific tax levied under a statute of this State upon persons engaged in the conduct of a particular business is not violative of par. 3, sec. 8, art. 1 of the constitution of the United States, as being an interference on the

part of the State with commerce between the several States, where the property employed in such business has been brought into this State and has itself become subject to taxation therein." In support of this ruling, the writer ventured to suggest (pp. 122–123) that as the property itself was within the State's jurisdiction and subject to a direct tax, "upon principle, the business of selling it [was] alike taxable in that jurisdiction." It appeared in the case of *Walton & Carr* v. *Augusta,* 104 *Ga.* 757, that the plaintiffs were "persons engaged on their own account in a 'commercial street brokerage business,' in the course of which they [took] orders for goods to be filled by non-resident dealers" who were regular "correspondents" and with whom the plaintiffs had large commercial dealings; and, upon the authority of Ficklen *v.* Shelby County Taxing District, 145 U. S. 1, we held that they were not exempt from a municipal tax imposed upon the class of brokers to which they belonged. In *Price Company* v. *Atlanta,* 105 *Ga.* 358, there was "evidence fairly warranting a finding that goods manufactured in another State were shipped in large quantities to a warehouse located in this State, and at that point divided and distributed among a number of customers who, after such shipment, had purchased different articles of these goods from a person going from house to house in a given city in this State, exhibiting samples and taking orders, which were then filled from such warehouse or distributing point." It was accordingly held that "the sales so made did not in any sense constitute interstate commerce, and the person so selling became liable to a license-tax as a canvasser." Precisely the same doctrine was also applied in *Duncan's* case, Ibid. 457, and it was further ruled that, "When one person travels through the country as an itinerant, exhibiting samples of goods and taking orders for goods of like character, and another follows in his wake, delivering the goods thus sold, both should be regarded as peddlers when it appears that the business was thus conducted in pursuance of a scheme to evade the law of this State requiring peddlers to register and pay taxes." The question herein dealt with was incidentally involved in *Chrystal* v. *Macon,* 108 *Ga.* 27, but, as it was not necessary in that case to pass upon this precise point, no ruling thereon was made. There it appeared that the Chicago Portrait Company

was conducting in this State, through agents, its business of taking orders for portraits and selling picture-frames. Some of these agents solicited orders, which were forwarded to the company to be filled, while others, after shipment to them here of the portraits ordered, delivered the same to customers and made collections. To each customer was given the privilege of "selecting and purchasing from the" company's agents in this State "a suitable frame for every portrait from a stock of frames shipped to Georgia for this purpose," but no customer obligated himself to purchase a frame or was called upon to do so until delivery of the portrait ordered by him was made. We therefore held that in so far as the "sale of the frames" was concerned, this was "a Georgia business, pure and simple," with "no interstate feature."

On the argument here, counsel for the plaintiffs in error relied mainly on the decision of the Supreme Court of Louisiana in the case of McClellan v. Pettigrew, 44 La. Ann. 365, the facts of which were somewhat similar to those of the case at bar, wherein that court held that where goods belonging to a non-resident are not within the State at the time his agent solicits orders therefor, and are subsequently shipped direct to such agent merely for the purpose of filling the orders procured by him, "it is immaterial whether the sale is perfected by delivery" in that State. We can not, however, regard this decision as even persuasive authority, for it was based wholly on what we conceive to be an entire misconception of the rulings of the Supreme Court of the United States in Machine Co. v. Gage and Robbins v. Shelby County, supra, and no argument whatever was advanced to show that it is sound upon principle. We do not think it is. On the contrary, it appears very plain to us that when a traveling salesman so far departs from the vocation ordinarily pursued by a commercial traveler as to actually vend the goods for which he solicits orders, he ceases to be a mere "drummer" in the sense in which that term is used by Mr. Justice Bradley in Robbins' case. We so hold upon principle, for not until further light on the subject is shed by the Federal Supreme Court can we hope to better reflect its views than by assuming, as we do, that its decisions

were intended to be construed with reference to the controlling facts upon which the same were based.

2. The ruling announced in the preceding division of this opinion disposes of the case in so far as Pettigrew, "the uncommercial traveler" of the Racine Iron Company, is concerned. Of course property belonging to that company is not subject to levy and sale under an execution issued against its agent, it not being itself liable for the payment of his license tax. *Wrought Iron Range Co.* v. *Johnson*, 84 *Ga.* 754; *Bohannon* v. *Wrought Iron Range Co.* 111 *Ga.*, post. But it by no means follows that there was any occasion for granting the extraordinary equitable relief which the company sought to obtain. It can not justly complain of the proceedings taken or threatened to be instituted against Pettigrew because of his failure to comply with the laws of this State. Assuming that the property levied on really belongs, not to him, but to his principal, it should have interposed a claim. Having, under section 899 of the Political Code, a clear statutory right to do so, it had no need whatever for an injunction.

*Judgment affirmed. All the Justices concurring*