JONES *v.* STEWART, tax-collector, *et al.*

In framing the general tax act of 1900, the legislature did not contemplate that one illegally conducting a stock exchange should be dealt with otherwise than as an offender against the laws of this State and, as such, subject to fine and imprisonment under criminal process. This being so, such an offender is not properly to be regarded as a tax defaulter against whom a tax-collector has authority to issue an execution with a view to compelling payment of the occupation tax which that act imposes upon dealers in "futures," who lawfully embark in business agreeably to its provisions.

Cobb and Lamar, JJ., dissenting. 1. While the lawmaking power of the State may provide, as the exclusive method of collecting the public revenue, for the indictment of the delinquent taxpayer, and thus have the State dependent for its revenue upon the uncertainties of the administration of the law in the criminal courts, legislation providing such a system as the only mode of collecting taxes being so opposed to common sense, sound business principles, and a wise public policy, no court should ever hold that the lawmakers intended to adopt it and thus leave the collection of the revenue to the uncertainties of verdicts of juries in criminal cases, unless the language of the law which is claimed to have this effect is so unequivocal that there can not possibly be any escape from the conclusion that such was the intention of the lawmakers.

2. There is nothing in the general tax act of 1900 which unequivocally indicates that it was the legislative intention that any of the specific taxes therein provided for were not to be collected by execution, but only by indictment of the delinquent taxpayer.

3. While construing the tax act above referred to as simply providing a cumulative remedy by indictment may, under the peculiar phraseology of that act, have the effect of working a hardship upon the delinquent taxpayer and pos-

62

sibly of double-taxing him, it is rather to be inferred that the legislature intended this hardship upon the delinquent taxpayer than that it intended the inconvenience and loss to the public that would necessarily result from a construction holding that the larger portion of the specific taxes provided for in that act could be collected only through the processes of the criminal courts.

Argued January 23,—Decided June 4, 1903.

Petition for injunction. Before Judge Lumpkin. Fulton superior court. June 24, 1902.

*Anderson, Anderson & Thomas,* for plaintiff.
*Brown & Randolph* and *Rosser & Brandon,* for defendants.

FISH, J. This case turns upon the question whether or not, in view of the provisions of the general tax act for 1901–1902, with respect to the occupation tax imposed upon dealers in "futures," a tax-collector has power, under the Political Code, § 894, to issue a tax execution against one who, without registering or paying the tax provided for by that act, engages in the business of conducting a stock exchange. See Acts of 1900, pp. 21, 25, 27–8. If such an execution can lawfully issue, the tax-collector is undoubtedly the official authorized to issue it; for the code section just cited designates him as the proper official to issue all tax executions to enforce the payment of "taxes against persons who are not required to pay to the treasurer," while it is expressly declared in section 3 of the act of 1900 that the occupation tax imposed on dealers in "futures" shall be "paid to the tax-collectors of the counties where" the business of such dealers is conducted. So the precise point presented for determination is: Does that act contemplate that a person who assumes to embark in such business without first complying with the requirements therein mentioned, as to registering and paying in advance an occupation tax, shall be regarded by the tax-collector as occupying the situation of a mere tax defaulter, and proceeded against accordingly? The answer to this inquiry must depend entirely upon the intention of the General Assembly, as indicated by the language employed in the expression of its legislative will; for its powers in the premises were, as we shall endeavor to show, practically unlimited and supreme. On the argument before us, counsel for the plaintiff in error insisted, that, looking to the character of the business of buying and selling cotton "futures," and the amount of the tax laid thereon, the evident purpose of the legislature was to

exercise the police powers residing in the State, with a view to discouraging the transaction of a business which had a demoralizing influence upon the public, and was therefore to be frowned upon, if not altogether prohibited. In other words, that the burden imposed upon the occupation pursued by those engaged in this business was a license or privilege tax, pure and simple. On the other hand, opposing counsel contended that this burden was imposed merely for the purpose of raising revenue, and accordingly, the intent of the General Assembly was simply to exercise the taxing power of the State by imposing an occupation tax upon those engaged in a business which was recognized as entirely lawful and legitimate. Our opinion is, that, so far as the present case is concerned, it makes not a particle of difference which of these two conflicting views is correct.

"Under the constitutions of the various States, the legislatures may require a license to engage in any trade, business, or profession;" though, of course, the license "must be uniform, and must not discriminate in favor of one class and against another." 13 Am. & Eng. Enc. L. 520. The sovereign power of a State to lay a revenue tax upon any business or profession is not to be questioned; and it may at one and the same time impose such tax, and, in the exercise of its police powers, prescribe reasonable regulations as to the manner in which any occupation shall be conducted. Cooley on Tax. (2d ed.) 586-7. "'The right of any sovereignty,' says Judge Cooley, 'to look beyond the immediate purpose to the general effect neither is nor can be disputed. The government has general authority to raise a revenue and to choose the methods of doing so; and has also general authority over the regulation of relative rights, privileges, and duties, and there is no rule of reason or policy in government which can require the legislature, when making laws with the one object in view, to exclude carefully from its attention the other. Nevertheless cases of this nature are to be regarded as cases of taxation. Revenue is the primary purpose, and the regulation results from the methods of apportionment that are resorted to in obtaining the revenue. Only those cases where regulation is the primary purpose can be specially referred to the police power.'" Black on Intox. Liq. § 107. "And where the legislature has power to tax an occupation, it has the further power to make it a penal offense to engage in that occupation without

first paying the tax imposed." Ibid. "An act making it indictable to practice any trade without a license is constitutional." 2 Desty on Tax. 772. So it "is competent to provide for enforcing license taxes by imprisonment of the delinquent." Id. 770. And, it has been held, "a statute abolishing imprisonment for debt does not prevent imprisonment for non-payment of taxes;" nor does the "bill of rights . . forbid the enforcement of a tax by imprisonment of the delinquent, when no personal property can be found out of which to make the tax." Id. 769. That is to say, there is no legal or constitutional obstacle in the way of a legislative body providing for the collection of any kind of taxes by criminal process, if such body is vested with general powers over the subject of taxation and has a right to exercise the police powers of the State. "When a city has the power both of taxation and police delegated to it, it is immaterial under which the license is required." Burroughs on Tax. 392. But, of course, the naked power to tax conferred upon a municipality does not comprehend authority to regulate or to tax unto death. *Morton* v. *Macon,* 111 *Ga.* 162. "A tax laid for the double purpose of regulation and revenue must be grounded on both the police and the taxing power; and the grant of the power to tax will not authorize the imposition of a burden in its nature and purpose prohibitory." 2 Desty on Tax. 1384. As is pointed out in Judson on Tax. § 411: "The power of taxation in the licensing of employments is closely allied to the police power of regulation. A license may be imposed for the purpose of regulating an employment, as a police measure for the public safety, and also as a means of revenue. . . There is no necessary connection between a license and a tax upon the right to engage in a business. The former confers a privilege; the latter is levied for the exercise of a privilege. But both taxation and regulation may be effected in the form of a license by the same statute. This right to tax and regulate occupations for purposes of revenue and under the police power may be delegated by the State to municipalities, and the latter can then exercise such power without violation of due process of law." In this connection, the author cites approvingly the case of Gundling *v.* Chicago, 177 U. S. 183, and quotes the following extract from the opinion therein delivered: "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country,

and what such regulations shall be, and to what particular trade, business, or occupation they shall apply, are questions for the State to determine, and their determination comes within the proper exercise of the police power by the State; and unless the regulations are so utterly unreasonable and extravagant in their nature and purposes that the property and personal rights of the citizen are necessarily, and in a manner wholly arbitrarily, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for Federal interference." See, also, *Alexander* v. *State*, 86 *Ga.* 246.

It is to be observed that in the present case the right of the General Assembly to impose the occupation tax laid upon dealers in "futures" is in no way questioned. Were this otherwise, we would, in conformity to the view expressed in *Racine Iron Co.* v. *McCommons*, 111 *Ga.* 542-3, 546–7, unhesitatingly hold that the purpose of the general tax act now under consideration was to "raise revenue for the support of the State government," and that the laying of the occupation tax imposed upon such dealers was, therefore, properly to be regarded as "an exercise, not of the police power, but of the taxing power" of the State. The provisions of that act with regard to registering, as well as the penalty prescribed for conducting business without first acquiring, in the way therein pointed out, a right to engage in the occupations mentioned, are, of course, to be referred to the police powers of our sovereign, the State. That the General Assembly, by one and the same statute, exercised both taxing and police powers in providing upon what terms a given occupation could be pursued, can not, as has been seen, affect the validity of that statute; since no one who is either unwilling or unable to bear his share of the expenses of government by paying a revenue tax required of all persons following a particular business calling has any constitutional·right to engage therein, however innocent and legitimate that calling may be. In discussing this feature of the case, our object has been to point out the fact that, in endeavoring to ascertain and give effect to the legislative will, we are free to adopt that construction of the act of 1900 which appears most likely to be in accord with the true intent and purpose of the General Assembly, rather than one which, though based upon less plausible reasoning, should control, were we embarrassed by being constrained to

follow that cardinal rule of construction which contemplates that, whenever possible, a statute should be so construed as to render it constitutional.

The scheme of the legislature, as evidenced by the provisions of the general tax act of 1900, seems to have been: (1) to fix the yearly occupation tax to be paid by dealers in "futures" at $1,000; (2) to provide for a record disclosing the names of all dealers lawfully engaged in the business, to the end that they might readily be known and distinguished from such persons as should unlawfully embark therein; (3) to require each dealer who registered to pay, in advance, to the tax-collector, as a condition precedent to the right to commence business operations, the revenue tax just mentioned; (4) to provide a punishment for every person who should attempt to carry on business without complying with the requirements of the statute; and (5) to enforce, by criminal process, its terms, with a view to discouraging any violation thereof, and at the same time protecting the interests of both the State and all legitimate dealers by exacting, in the way of a fine, a double tax from each and every offender who should seek to evade the common burden which all such dealers were called upon to bear.    It was in that act (sec. 4, p. 27) expressly declared that " before any person " should " be authorized to carry on said business" he should " go before the ordinary of the county " wherein he proposed "to do business, and pay [the stipulated occupation tax] to the tax-collector;" that it should " be the duty of said ordinary to immediately notify the comptroller-general and the tax-collector;" and that: " Any person failing to register with the ordinary, or, having registered, failing to pay the tax " required, should " be liable to indictment for misdemeanor, and on conviction [should] be fined not less than double the tax, or be imprisoned as prescribed by section 1039 of volume III of the Code of 1895, or both, in the discretion of the court."    The act also contained, in this connection, the following provision: " One half of said fine shall be applied to the payment of the tax, and the other to the fund of fines and forfeitures for use of officers of court."

It was earnestly insisted by counsel for the defendants in error that the General Assembly contemplated that every dealer in " futures," whether lawfully or unlawfully engaging in business, should be civilly liable for the payment of the tax laid, and that the pun-

ishment prescribed for persons failing to comply with the terms of the statute was intended as a mere penalty, to be imposed irrespectively of whether they had been, or might be, required by civil process to pay such tax. In support of this position, counsel present the argument, that, under the express terms of the act, "there is to be an indictment in ·case of failure to register, as well as for failure to pay the tax;" and as "he who pays and does not register is none the less guilty," it is not to be presumed the legislature intended that one failing to comply with his civil obligation to pay should stand upon any better or worse footing than another who, like himself, had failed to register before commencing business, but who had subsequently voluntarily or involuntarily actually paid his tax. The suggestion is also made that the mandate of the statute with regard to the application to be made of every fine imposed by the court really affords no aid in arriving at the intention of the legislature respecting a delinquent's liability under civil process; for that mandate must necessarily prove meaningless and impossible of observance in many cases, since "one half of said fine" can not, as directed, be "applied to the payment of the tax," if, as matter of fact, the offender paid it before commencing business, and is fined for his failure to register. The weakness of this position consists in the unwarranted assumption on the part of counsel that there can arise, in the regular order of things, a case where "the man to be punished may have paid the tax, only failed to register." The General Assembly evidently did not, and could not reasonably be expected to, anticipate such an emergency. It could arise in one of two ways only : (1) by a person wishing to become a dealer pursuing precisely the opposite course to that he was directed to follow, viz., by first having audience with the tax-collector, instead of the ordinary, in his quest for qualification to do business; and (2) by the enforcement of a tax execution issued against him by the tax-collector. That our lawmakers did not provide for an emergency of this kind, when directing how fines should be applied, tends very strongly to indicate that they did not contemplate that such an emergency should be brought about by the involuntary payment of a tax fi. fa. issuing from the tax-collector's office.

It was contemplated that dealers should first register, then pay — not first pay, and then register. Otherwise, it would doubtless have

been declared to be the duty of the tax-collector "to immediately notify" the ordinary that a prospective dealer had paid the required tax.    Nor was it anticipated that a tax-collector should demand or permit payment of the tax until after the requirement as to registering had been complied with; for to do so would be to give countenance to a needless departure from the course that the legislature declared should be pursued.    After carefully considering the provisions of the general tax act of 1900 in the light of prior legislation with regard to the taxing of dealers in "futures," we have reached the conclusion that the legislative intent, as expressed in that act, was that persons who should engage in buying and selling those speculative commodities should be treated as belonging to one or the other of two classes, viz.: one composed of authorized dealers, and the other of criminals.    So far as we can gather from the language employed in that act, no recognition was given to a third class, to be known and regarded as delinquent or defaulting taxpayers.    In the absence of a clear expression of legislative will, it is never to be assumed that the members of a legislative body have deemed it consistent with the dignity of a sovereign State to call upon criminals to share with it the fruits of an illegal enterprise into which they have ventured.

We are satisfied that, in passing the act now under consideration, the General Assembly hoped the severe penalty prescribed for a violation of its terms would, if offenders were treated as criminals and promptly brought to trial and conviction, result in deterring others from seeking to evade the tax, and thus bring about a state of affairs more beneficial to the public interests than could be expected to flow from a statute providing for a mere nominal penalty, and contemplating that the tax-collector should proceed to enforce by civil process payment of the tax, if collectible.    The legislators might well have concluded that a sheriff armed with a bench warrant can more readily find the person against whom it is directed than he can discover the subject-matter to which a fi. fa. placed in his hands refers in general terms.    Taking into consideration that the court has no discretion over the amount of the fine to be imposed; that it must be "not less than double the tax," in any case which calls for punishment by fine; that "one half of said fine shall be applied to the payment of the tax;" and that, if the court thinks proper, the offender may be still further punished by imprisonment,

we think it far from probable that the General Assembly contemplated that after the full penalty had been imposed upon an offender, and he had served out his sentence, paid in full his fine, reformed and entered upon a life of usefulness, the sheriff should, at the instance of the tax-collector, enforce payment of an execution issued for the purpose of collecting the tax which such offender had neglected, before commencing business, to pay. If such an execution could, at any time before conviction, lawfully be issued, it could as well issue after conviction, and be enforced even after the death of the offender, if it and a sufficient estate survived him.

The expedient of requiring, under penalty, registry with the ordinary and payment in advance to the tax-collector of an occupation tax was, for the first time, in 1881 resorted to by the General Assembly of this State. Acts of 1880-81, pp. 42-3. Only liquor dealers came under the operation of this new scheme for raising revenue. Subsequently an occupation tax was laid upon dealers in "futures;" but they were not required to register, or to pay in advance; nor were they made subject to any penalty for non-payment. Acts of 1882-3, pp. 34, 37. Evidently the legislative intent was that the tax imposed upon this class of dealers should be enforced, in the ordinary and usual way, under a tax fi. fa. issued by the tax-collector. The general tax act for the years 1885-6 provided that this tax should be payable at the time of commencing business, though no change in the mode of its collection was adopted. Acts of 1884-5, pp. 20, 24. Nor was any such change effected by the tax act for the years 1887 and 1888. Acts of 1886, pp. 14, 17, 19. For the first time in 1888 were dealers in "futures" required to register with the ordinary. Failure to do so was made a misdemeanor, punishable by a fine of "not less than fifty dollars, nor more than two hundred dollars;" but no penalty for failure to pay the tax before commencing business was imposed. Acts of 1888, pp. 19, 22, 23. However, in the next general tax act it was expressly declared, (1) that failure to pay the tax should be deemed a misdemeanor; (2) that the punishment for such failure should be a fine of "not less than double the tax," or imprisonment, or both, in the discretion of the court; and (3) that "one half of said fine [should] be applied to the payment of the tax." Acts of 1890-91 (vol. 1), pp. 35, 38, 40. This new plan of coercing dealers in "futures" into paying in ad-

vance the occupation tax imposed upon them has since been adhered to by the General Assembly as being best in accord with its policy in such matters. See Acts of 1892, pp. 25, 27 ; Acts of 1894, pp. 21, 23 ; Acts of 1896, pp. 25, 26; Acts of 1898, pp. 25, 27 ; Acts of 1900, pp. 25, 27 ; Acts of 1902, pp. 23, 27.

If the radical change in policy above pointed out was not intended to have the effect of introducing a new and exclusive mode of dealing with persons embarking in business without authority, we are at a loss to perceive why this change should have been considered either necessary or expedient. Presumably the General Assembly concluded to abandon entirely the "credit system," as applied to dealers in "futures," by requiring them to pay in advance ; and to discountenance altogether, by regarding and punishing as criminals, all persons who should unlawfully engage in the business. To intelligently and faithfully carry into effect this scheme would obviate all necessity of issuing a tax execution against anybody who dealt in "futures." No one lawfully pursuing his occupation could possibly owe to the State any business tax. Persons violating the law should be promptly arrested and called upon to settle with the court, and not with the tax-collector. That official has no general authority of law, and should not be expected, to issue a fi. fa. designed to compel payment of an occupation tax by one who follows the calling of a professional burglar, or that of any other class of criminals — not even excepting that class of criminals who commit the offense of dealing in "futures" contrary to the provisions of a penal statute.

Counsel for the defendants in error cited and relied on the case of *Hight* v. *Fleming*, 74 *Ga.* 592, as sustaining their position that a tax execution could lawfully be issued by the tax-collector, despite the provisions of a statute such as that we are now called upon to construe. The first headnote to that case reads as follows : " A tax-collector is authorized to issue an execution for an unpaid liquor tax." This would seem to indicate that the court, in passing upon that case, undertook to consider, in all of its aspects, the question whether or not there was any legal obstacle in the way of issuing such an execution against a person engaged in the liquor traffic who had failed to pay the revenue tax imposed upon that business. But the headnote, being prepared by the reporter, instead of by the court, is not to be regarded as its official utterance.

In point of fact the court did not undertake to deal exhaustively with that question.   It appears from the bill of exceptions and the record in the case (which are of file in the office of the clerk of this court) that the objection urged against the issuance of the fi. fa. was, that the law did not contemplate that a tax-collector should issue an execution to collect a tax imposed upon any business calling, since he did not have before him the proper or sufficient data upon which to rest a decision as to the liability of a particular person to pay that kind of a tax.   What this court really ruled was, that the tax-collectors were the officials designated by law to pass upon the liability of any individual to pay any given occupation tax, and accordingly had full power to issue against him an execution therefor, if satisfied he was subject to, but had not paid, the same.   Mr. Justice Blandford, who delivered the opinion of the court, thus summarily disposed of the point relied on by the excepting party : " The plaintiff in error insists that the tax-collector had no authority to issue an execution for the liquor tax, but we think section 886 of the Code answers this objection."   That section contained the same provisions as are now embraced in our present Political Code, § 894, which, in general terms, declares that tax-collectors are authorized to issue executions " for non-payment of taxes against persons who are not required to pay to the treasurer, . . as soon as the last day for payment has arrived."   The construction which the court in that case placed upon this language entirely meets with our approval ; and we are content to follow the decision which was actually rendered, though we can not regard it as having any controlling influence over the case in hand

Our attention was also called to the case of *Sasser* v. *Adkins,* 108 *Ga.* 228, wherein it appeared that a tax-collector had issued against Sasser a tax fi. fa. for a certain amount claimed to be due as "special State taxes for selling spirituous liquors," and that Sasser had filed an affidavit of illegality to such fi. fa.   In the brief filed in behalf of the defendants to the present writ of error, their counsel very candidly concede, however, that "No question was made in that case as to the right of the tax-collector to issue the fi. fa."   There are other cases appearing in our reports, wherein the authority of a tax-collector to issue executions of this character might, perhaps, have been successfully challenged, but was, in point of fact, not even questioned.   See *Sheffield* v. *Board of Commissioners,*

111 *Ga.* 1, *McCommons'* case, Id. 536, and *Stewart* v. *Kehrer,* 115 *Ga.* 184. They should have no weight in the determination of the question with which we are now confronted, and upon which we do now undertake to expressly and definitely rule.

. *Judgment reversed.* *Simmons, C. J., and Candler, J., concur. Lumpkin., P. J., absent. Cobb and Lamar, JJ., dissent.*

CANDLER, J.    I concur in the judgment rendered, as does also the Chief Justice, and agree with the views expressed by Mr. Justice Fish. In my opinion the General Assembly, in order to prevent persons dealing in the business of a stock exchange from trifling with the State authorities, intended to provide, as the exclusive remedy for the collection of this tax, for the prosecution in the criminal courts of those who should default in its payment. On the evidence appearing in this record I do not think there would be any doubt about the conviction of. the plaintiff in error upon a. criminal prosecution. The facts relied upon by him to excuse his failure to pay the tax furnish no legal defense to such a prosecution; and I am satisfied that the danger of a fine in double the. amount of the tax, with the possibility of a jail sentence, or sentence upon public works, or all three in the discretion of the court, will go far toward enforcing the prompt collection of this tax. As a rule, those who carry on this class of business have no visible property upon which a tax execution could be levied. The judges who preside over the criminal courts of the State, and the jurors. who pass upon the facts submitted to them, can be relied upon to do their duty, keeping in view the fact that the General Assembly has placed upon them the burden of collecting such taxes from those who refuse to pay.

COBB, J., dissenting.    The usual and recognized method for the collection of taxes due the State is by an execution issued against the property of the taxpayer. Political Code, §§ 894, 949 (5); *Hight* v. *Fleming,* 74 *Ga.* 592. This method has been recognized as the usual one by the courts of this State, as well as by the legislative and executive departments of the government, for nearly one hundred years. See *Gladney* v. *Deavors,* 11 *Ga.* 79; *Hight* v. *Fleming,* supra; *Singer Mfg. Co.* v. *Wright,* 97 *Ga.* 114; *Sasser* v. *Adkins,* 108 *Ga.* 228; *Stewart* v. *Kehrer,* 115 *Ga.* 184; Code of 1863, § 858 (5); Code of 1868, § 3499; Code of 1873, § 886; Code of 1882, § 886. In view of this fact, whenever the Gen-

eral Assembly provides for the collection of taxes either upon property or of specific taxes upon occupation, it is to be inferred that the tax was to be collected in the usual way, that is, by execution, and that if any other method is provided it is intended to be merely cumulative of the method of collecting by execution. So well established is the practice of collecting taxes by execution against the property of the taxpayer, that the substitution of any other method as the exclusive method must result from express enactment couched in unequivocal words. The lawmaking power of the State may, if it sees proper, use the processes of the criminal courts to aid in the collection of its revenue. While these processes are effectual as aids in the collection of taxes in some cases, to rely upon them entirely would imperil the collection of the revenue, and the support of the government would be dependent upon the uncertainties of verdicts in criminal cases. The State has the power to look exclusively to such a system for the collection of its revenue; but it will never be presumed that such was the intention of the lawmaking body, unless the language of the law claimed to have this effect is such as to expressly exclude the method of collecting by execution. A system which is exclusively dependent upon prosecutions by indictment of the delinquent taxpayer is so opposed to common sense, sound business principles, and a wise public policy, that it will not be presumed that any body of lawmakers intended to leave the State dependent for its revenue for the support of the government upon the uncertainties of such a system. It may be that, under the peculiar language of the tax act under consideration, hardships may result upon the taxpayer who has failed to comply with the law; but it is better that the taxpayer who has failed to comply with the law after having had abundant opportunity to do so should suffer, than that the public should suffer by giving a construction to the act which would bring about the disastrous consequences which would inevitably follow from the State's relying for the collection of its revenue upon verdicts in criminal cases. For the foregoing reasons I am compelled to dissent from the judgment rendered in the present case. I am authorized by Mr. Justice Lamar to say that he concurs in the views above presented.